AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplica

**FILED**
CLERK, U.S. DISTRICT COURT

5/10/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: *Felicia Monroe* DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT

5/10/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ JB _____ DEPUTY

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>OSVALDO NICOLINI,<br><br>Defendant | Case No.   2:23-mj-02359-DUTY |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 22, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

|  |  |
|---|---|
| *Code Section* | *Offense Description* |
| 21 U.S.C. § 841(a)(1) | Distribution of a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Hannah Monroe
*Complainant's signature*

Hannah Monroe, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   5/10/23

*Judge's signature*

City and state:   Los Angeles, California    Hon. Charles F. Eick, U.S. Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT</u>

I, Hannah M. Monroe, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1. This affidavit is made in support of criminal complaints and arrest warrants against the following individuals for the following violations:

a. Patricia Amelia LIMON ("LIMON") for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance;

b. Jesus Chuy DELGADO ("DELGADO") for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance;

c. Ramon GONZALEZ, Jr. ("GONZALEZ") for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance;

d. Jose Francisco Martinez HERNANDEZ ("HERNANDEZ") for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance;

e. Cristobal AGUILAR ("AGUILAR") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance;

f. Guillermo GUERRERO ("GUERRERO") for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm;

g. Lake Davis PASLEY ("PASLEY") for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance; and

h.   Osvaldo NICOLINI ("NICOLINI") for a violation of 21 U.S.C. § 841(a)(1): Distribution of a Controlled Substance.

2.   This affidavit is also made in support of an application for warrants to search the following premises, vehicles, and persons:

a.   The premises located at 25527 Alliene Avenue, Lomita, California, 90717, believed to be the residence of LIMON, as described more fully in Attachment A-1 ("Limon Residence");

b.   A red, 2020 model year Chevrolet Camaro, bearing California license plate 9DFF932 and Vehicle Identification Number ("VIN") 1G1FH3D75L0109806, used by LIMON and NICOLINI, as described more fully in Attachment A-2 ("Limon/Nicolini Camaro");

c.   The person of LIMON, as described more fully in Attachment A-3;

d.   The person of NICOLINI, as described more fully in Attachment A-4;

e.   The premises located at 900 W. 14th Street, Apt. 9, San Pedro, California, 90731, believed to be the residence of DELGADO, as described more fully in Attachment A-5 ("Delgado Residence");

f.   A black, 2007 model year Chevrolet Tahoe, bearing California license plate 7UTY038 and VIN 1GNFC13087R207008, used by DELGADO, as described more fully in Attachment A-6 ("Delgado Tahoe");

g.   The person of DELGADO, as described more fully in Attachment A-7;

h.   The premises located at 18346 Yucca Street, Hesperia, California, 92345, believed to be the residence of GONZALEZ, as described more fully in Attachment A-8 ("Gonzalez Residence");

i.   A black Chevrolet Silverado, bearing Washington State license plate C79191H and VIN 1GC4K0E81FF545897, used by GONZALEZ, as described more fully in Attachment A-9 ("Gonzalez Silverado");

j.   The person of GONZALEZ, as described more fully in Attachment A-10;

k.   The premises located at 14312 ½ Orange Avenue, Paramount, California, 90723, believed to be the residence of HERNANDEZ, as described more fully in Attachment A-11 ("Hernandez Residence");

l.   A silver 2005 model year Toyota Corolla, bearing California license plate 8WWT414 and VIN 1NXBR32E05Z452115, owned by HERNANDEZ, as described more fully in Attachment A-12 ("Hernandez Corolla");

m.   The person of HERNANDEZ, as described more fully in Attachment A-13;

n.   The premises located at 8415 S. San Pedro Street, Los Angeles, California, 90003, believed to be the residence of GUERRERO, as described more fully in Attachment A-14 ("Guerrero Residence");

o.   A red 2017 model year Chevrolet Silverado, bearing California license plate 23993Z2 and VIN 3GCPCNEC4HG470691, owned by GUERRERO, as described more fully in Attachment A-15 ("Guerrero Silverado");

p.   The person of GUERRERO, as described more fully in Attachment A-16; and

q.   The person of PASLEY, as described more fully in Attachment A-17.

3.   The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances); 846 (conspiracy and attempt to distribute controlled substances); 860(a) (distribution of controlled substance in, on, or within 1,000 feet of, a schoolyard or campus of school); 18 U.S.C. §§ 922(a)(1)(A) (engaging in business of dealing in firearms without a license); 922(g) (felon in possession of a firearm/ammunition); and 371 (conspiracy) (the "Subject Offenses"), as described more fully in Attachments B-1, B-2, B-3, and B-4.  Attachments A-1 through A-17 and B-1 through B-4 are incorporated herein by reference.

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints, arrest warrants, and search warrants, and does not purport to

set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent of the Federal Bureau of Investigation ("FBI"), United States Department of Justice, and have been so employed for approximately eight years.  Prior to becoming a Special Agent, I was a Staff Operations Specialist with the FBI for approximately two and a half years.  I am currently a member of the FBI's Violent Crime Major Offenders squad in Long Beach, California.

6.    Since joining the FBI in 2014, I have received training in the investigation of violations of criminal law, such as drug-trafficking, firearms offenses, computer-related crimes, and financial fraud, including several hundred hours of formal training at the FBI Training Academy in Quantico, Virginia.  During the time that I have been employed by the FBI, I have participated in investigations relating to organized crime, home-grown violent extremism, access device fraud, identity theft, narcotics, and computer intrusions.  I have participated in many aspects of criminal investigations including the issuance of subpoenas, reviewing evidence, conducting electronic and physical surveillance, working with informants, and the execution of search and arrest warrants.  Additionally, I have interviewed and/or debriefed informants and other witnesses who had personal knowledge regarding the subject

matters of the investigations in which I have been involved, including narcotics trafficking and firearms offenses.

### III. STATEMENT OF PROBABLE CAUSE

7. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. FBI/LAPD Investigation of Westside Wilmas, Mexican Mafia, and Their Drug and Firearms Trafficking Activities in the Harbor Area**

8. Since December 2020, the Los Angeles Police Department ("LAPD") and the FBI have investigated influential members of the Westside Wilmas street gang and their associates who are believed to be involved in a host of illicit activities including drug trafficking, weapons trafficking, extortion, robbery, and other violent acts.

9. Westside Wilmas members commit the crimes of their organization under the larger direction and authority of the Mexican Mafia, a prison-based gang in California that controls many of the Hispanic street gangs in and around Los Angeles.

10. Mexican Mafia leaders and associates direct the activities of the Westside Wilmas gang from within the California state prison system. Leaders have access to illicit cellular telephones and other digital devices that they use to communicate with members and associates of the street. Mexican Mafia leaders also designate Westside Wilmas members for leadership roles and responsibilities and ensure that the Mexican Mafia receive their allotted portion of the revenues generated from the Wilmas' criminal activities.

11.   Based on my conversations with confidential human sources, my investigation in this case, and other information from digital devices seized from Westside Wilmas members, I believe that the Westside Wilmas are controlled by a Mexican Mafia member named Raul Garcia Molina, or "R." Molina is currently housed at a California Department of Corrections and Rehabilitation ("CDCR") facility serving a life without parole sentence for murder.

**B.   CS-1 Asks Molina for Assistance in Finding Drug Supplier for Undercover Officer Posing as Drug Buyer, Molina Directs CS-1 to His Imprisoned Associate, Nunez**

12.   On October 19, 2022, CS-1[1] contacted Molina using the audio call function of the WhatsApp messaging application ("WhatsApp"). CS-1 told Molina that he had someone looking to buy pills or meth. Molina asked, "in the calles [streets] or?" CS-1 replied that the buyer was in the Harbor area. Molina replied that he would give CS-1's number to someone who would be get in touch with him.

13.   Several minutes later, CS-1 received a WhatsApp message from an individual who identified himself as "Rapido," or "Speedy." Based on my investigation, I believe that "Rapido" or "Speedy" is Westside Wilmas gang member and Mexican Mafia associate Daniel Nunez. Nunez is currently housed at San Quentin State Prison, a CDCR facility, where he is serving a death sentence for murder.

---

[1] CS-1 is working with law enforcement in exchange for potential sentencing consideration. CS-1 has a prior conviction for murder.

14.  CS-1 provided Nunez with the WhatsApp number of an individual posing as a drug and gun customer but who was, in fact, an undercover law enforcement officer (the "UC").  Nunez asked CS-1 to tell the UC that he would be calling.

15.  A few minutes later, Nunez called the UC and said he had received UC's number from CS-1.  Nunez then offered to sell the UC fentanyl (blue or multi-colored pills) or methamphetamine that would be delivered in Los Angeles.

16.  Over the next five months, the UC purchased methamphetamine, fentanyl, firearms, and ammunition from Nunez. Despite being on death row at a CDCR facility hundreds of miles away from Southern California, Nunez was able to communicate freely with the UC and many others outside the prison, negotiate drug and firearms deals, and facilitate timely delivery to locations in and around the Harbor area.

17.  On October 27, 2022, Molina made a video call to CS-1 via WhatsApp.  CS-1 thanked Molina for introducing him to "Speedy."  Molina asked if "Speedy was "able to make it happen for you guys," and CS-1 responded in the affirmative.  Molina said that "Speedy" was "the homie that makes it happen" and "puts everything out there."

   **C.   LIMON Handles Methamphetamine, Fentanyl, and Firearm Deals on Nunez's Behalf**

18.  Between October 2022 and February 2023, LIMON fulfilled seven drug and firearm deals that Nunez had negotiated with the UC from prison.  LIMON personally (or, in one instance, through an intermediary) supplied methamphetamine, fentanyl,

firearms, and ammunition to a confidential source posing as the UC's drugs and firearms trafficking associate ("CS-2") and collected money on Nunez's behalf.[2]  As discussed below, LIMON communicated directly with Nunez and the UC on three-way audio calls when finalizing details of these transactions.

        1.   <u>October 24-26, 2022 – LIMON Arranges for PASLEY to Deliver 224.6 g of Fentanyl</u>

19.  On October 24, 2022, Nunez agreed to sell the UC 5,000 rainbow fentanyl fills for $1 a pill, or a total of $5,000, in a WhatsApp text exchange using coded language.

20.  The next day, October 25, 2022, at 4:50 p.m., Nunez called the UC again and said that the UC should send someone to Lomita because the woman who was going to bring the fentanyl had a house there.  Nunez said that the woman would be ready with the fentanyl by 6 or 7 that night.

21.  Ten minutes later, at 5:02 p.m., LIMON called the UC from cell number (424) 401-6002 ("Limon Cell 1").  LIMON identified herself as "Patricia" and said she was calling on behalf of "Rapido," or Nunez.  LIMON told the UC that there would be a delay in delivering the fentanyl and initiated a three-way call with Nunez.  During this three-way call, Nunez addressed LIMON as "Trish," a common nickname for someone named Patricia.  Ultimately, the deal did not take place that day.

---

[2] CS-2 is working with law enforcement in exchange for financial consideration.  To date, CS-2 has been paid approximately $13,000 for her assistance.  CS-2 has a prior conviction for possession of a controlled substance for sale.

22. Subscriber records for Limon Cell 1 reflect that LIMON was the subscriber of that number from April 28, 2022, to February 9, 2023.

23. In addition, Nunez's description of LIMON as having a house in Lomita is corroborated by public records and recent surveillance. California DMV records reflect that LIMON has identified the Limon Residence in Lomita as one of her addresses. As discussed further below, cell phone location data for LIMON shows her at Limon Residence in Lomita during the late evening and early morning hours.

24. Further, I was able to identify LIMON's distinct voice on this call (and all other calls involving LIMON discussed in this affidavit) based on my review of multiple recordings of in-person interactions with LIMON during this investigation.

25. On October 26, 2022, at 8:08 p.m., Nunez, LIMON, and the UC had another three-way call to finalize arrangements for the fentanyl deal. LIMON told Nunez (in English) to tell the UC (in Spanish) that two guys would be coming to the deal and the "white boy" would come out to meet with whoever was picking up the fentanyl.

26. At 8:34 p.m., the UC then messaged LIMON directly at Limon Cell 1 identifying the address of 1299 Artesia Boulevard in Gardena as the location for the meeting. Several minutes later, LIMON called the UC and initiated a conference call with two other male voices. LIMON said that the fentanyl would be arriving at the deal in a black Honda and that a "gringo," or white guy, named "Chip" would be making the delivery.

27.   Law enforcement had sent another confidential informant posing as a drug buyer's associate ("CS-2") to 1299 Artesia Boulevard to pick up the fentanyl and hand over $5,000.

28.   At 8:43 p.m., a black Honda Accord, license plate number 8SDF160, arrived at 1299 Artesia Boulevard and parked in front of the CI's vehicle.  Surveillance officers saw a white male get out of the car and walk over to where the CS-2 was parked.  The white male handed CS-2 a plastic bag and took money from CS-2 while asking, "5 g's, right?"  CS-2 acknowledged that it was $5,000 and the two parted ways.

29.   Law enforcement later recovered the plastic bag from CS-2.  Inside, they recovered five separate clear plastic bags of fentanyl pills.  DEA laboratory testing later confirmed that the pills contained a total of 224.6 grams of fentanyl.

30.   On November 3, 2023, an LAPD officer contacted a confidential informant (the "CI")[3] and asked if the CI knew a male with the moniker of "Chip."  The CI replied that they knew someone named "Lake Pressley" that used that moniker.  A Facebook search for "Lake Pressley" led to the discovery of a Facebook account for PASLEY.  When law enforcement sent a picture of PASLEY to the CI, the CI identified PASLEY as the person who he knew as "Chip."

31.   Officers then searched the Los Angeles Consolidated Criminal History Reporting System ("CCHRS") for PASLEY and discovered a booking photograph that appeared to be the same

---

[3] The CI is working with law enforcement for monetary compensation.  The CI has a prior conviction for Grand Theft.

person from PASLEY's Facebook account.  Both surveillance officers from the deal and CS-2 identified a photograph of PASLEY as the person who delivered the fentanyl on October 26, 2022.  PASLEY is believed to be an associate of a white supremacist gang.

2.   November 2, 2022 - LIMON Supplies 547 g of Fentanyl

32.   On November 2, 2022, Nunez messaged the UC that he had good "fruit loops," or rainbow fentanyl pills, and that they were in Lomita with the woman (referring to LIMON).  Nunez agreed to sell the UC 5,000 fentanyl pills for $5,300.

33.   At 8:47 p.m., LIMON sent a text message to the UC from Limon Cell 1 with an address of "2155 PCH Lomita, CA 90117" for the deal.  Law enforcement dispatched CS-2 to that location and conducted surveillance of the resulting meeting. Law enforcement dispatched CS-2 to that location.

34.   At 9:35 p.m., LIMON arrived at the meeting location in a black Land Rover, parked next to CS-2, and the two briefly interacted.  CS-2 made an audio recording of the deal and LIMON's distinctive voice can be clearly heard speaking in English.  After greeting CS-2, LIMON counted out the five bags of pills aloud, "one, two, three . . ." and told CS-2 that the fentanyl was "good--really good."  CS-2 then handed LIMON $5,300 in buy money and the two parted ways.

35.   Law enforcement recovered what DEA laboratory testing determined to be a total of 547.357 grams of fentanyl.



36.   After the deal, law enforcement followed the Range Rover to the Limon Residence.  LIMON and a female companion got out of the car and went inside Limon Residence.

      3.   <u>November 17, 2022 – LIMON Supplies 1.706 kg of Methamphetamine and 218 g of Fentanyl</u>

37.   On November 17, 2022, the UC asked Nunez to buy five "aguas", or pounds of methamphetamine, and two thousand fentanyl pills.

38.   That same day at 4:20 p.m., Nunez and LIMON called the UC on a three-way call to discuss the deal.  Nunez agreed to sell the UC 4 pounds of methamphetamine for $800 a pound and 2,000 fentanyl pills for $2,000.  The UC asked for delivery of the drugs at 6:00 p.m. and, in English, Nunez addressed LIMON by her first name and asked her, "Trish?  Is that good?"  LIMON responded in English, "where at, though?"  Nunez replied, "Trish, wherever you want."   Nunez then offered to give the UC a total of 5,000 fentanyl pills with the additional 3,000 to be given on credit, and the UC accepted.  Nunez told LIMON, again in English, to give the UC 5,000 pills, give the money for the methamphetamine to "Diabla" and to hold onto the "2 racks," or $2,000 for the fentanyl, because that was "R's," or Molina's.

Nunez told the UC to coordinate directly with LIMON for deal logistics.

39.    At 6:03 p.m., the UC sent LIMON a text message at Limon Cell 1 with the address to meet at "Burger Kinh [sic] 20950 S. Figueroa St, Carson, Ca."  Seven minutes later, the UC called LIMON and confirmed that she had the address for the deal.  LIMON said she would be there in 20 minutes because she had to "go pick it up and then go over there."

40.    At 6:37 p.m., LIMON messaged the UC that she was in a small black Mercedes and heading to the deal location.

41.    At 6:56 p.m., LIMON arrived at the Burger King in a black Mercedes.  Law enforcement officers conducted surveillance of the meet.  LIMON gave CS-2 four pounds of methamphetamine and 2,000 fentanyl pills.  LIMON said she did not have the additional 3,000 pills with her and asked CS-2 to accompany her to a hotel on Pacific Coast Highway to get the rest of the pills.  CS-2 declined LIMON's invitation and ultimately gave LIMON $5,200--$3,200 for the four pounds of methamphetamine and $2,000 for the 2,000 fentanyl pills.

42.    Law enforcement recovered the purchased methamphetamine and fentanyl pills from CS-2.  DEA laboratory testing later determined that LIMON had sold CS-2 approximately 1.706 kg of actual methamphetamine and 218 grams of fentanyl.

43.    At 7:11 p.m., the UC called Nunez and said that LIMON had "brought four and two," or four pounds of methamphetamine and 2,000 fentanyl pills, and had wanted CS-2 to follow her to a

hotel but CS-2 was scared.  Nunez expressed exasperation and said he would fix this.

4.   December 6, 2022 – LIMON Supplies 224 g of Fentanyl and a Ruger, model SR45, .45 caliber Semi-Automatic Pistol

44.  On November 30, 2022, and December 1, 2022, the UC reached out to Nunez and asked to purchase methamphetamine, fentanyl, and "jugetes," code for firearms.  On December 4, 2022, NUNEZ sent the UC a picture of a firearm and messaged, "45. Ruger. What do you think?"

45.  The UC replied that he was interested and Nunez said he would sell the handgun for $1,050.

46.  On December 6, 2022, at 5:48 p.m., Nunez agreed to sell the UC 2,000 fentanyl pills and the Ruger .45 caliber pistol for a total of $3,050.  NUNEZ also asked the UC to give another $50 to "la muchacha" (LIMON) because she had picked up the drugs and the gun.  The UC agreed.  The UC then sent NUNEZ an address of "909 pacific coast hwy harbor city ca" for the deal.  At 6:37 p.m., the UC called NUNEZ and told him to tell LIMON to go to a taco place next door to the original location.  Around that time, CS-2 was waiting at the parking lot of the taco restaurant being watched by surveillance units.

47.  At 7:24 p.m., LIMON sent the UC a text message from Limon Cell 1 that she was on her way in a black Honda Accord.  A minute later, surveillance units saw LIMON arrive in the front passenger seat of a black Honda Accord, license plate number 8SDF160 (the same car that had transported PASLEY to the October 26, 2022 fentanyl deal discussed above).  Surveillance officers

saw LIMON get out of the car, meet with CS-2, and hand CS-2 a bag.  CS-2 then gave LIMON $3,100 in buy money.

48.   Law enforcement recovered the bag that was handed to the CS-2 that contained around 2,000 fentanyl pills as well as a Ruger model SR45, semi-automatic handgun, bearing serial number 38015305.

49.   A search of law enforcement databases for this Ruger .45 caliber pistol revealed that the Glendale (AZ) Police Department had reported it as stolen.

     5.   February 4, 2023 – LIMON Supplies 218.2 g of Fentanyl

50.   On February 2, 2023, the UC messaged Nunez and asked if he had "buttons," or fentanyl pills, available to purchase. Nunez said he had blue or rainbow fentanyl available and said that the same lady from all the previous buys, LIMON, would handle the deal.  At 7:24 p.m. that night, Nunez sent the UC photographs of four handguns.  When the UC asked how much to buy the guns, Nunez replied "4," or $4,000.

51.   On February 3, 2023, the UC confirmed that he would buy the guns and fentanyl the next day.  On February 4, 2023, Nunez and the UC confirmed that the deal would go forward. Nunez told the UC to give all the money for the fentanyl and guns to the woman who would be delivering the guns.

52.   At 3:11 p.m., LIMON called the UC from Limon Cell 1. The UC asked if Nunez had informed LIMON that the UC wanted to buy 2,000 fentanyl pills.  LIMON said that she had only blue fentanyl pills available.  LIMON agreed to do the deal for the

fentanyl at a McDonalds located at 1712 Pacific Coast Highway in
Lomita.

53.  At 4:11 p.m., LIMON sent UC a message, "Ok please give
me 10 minutes because I had to go to the storage to pick up los
dos," referring to the 2,000 fentanyl pills.  Two minutes later,
LIMON again told the UC in an audio call that she was near
"Carson Street and Crenshaw" and would be at the meeting
location in 5-10 minutes.  Law enforcement directed CS-2 to go
to the 1712 Pacific Coast Highway location to meet with LIMON.

54.  At 4:40 p.m., LIMON sent the UC a text message saying
that she would be arriving in a gray Hyundai Elantra.
Surveillance officers saw LIMON arrive at the McDonalds in a
gray Hyundai Elantra, license plate number 9DEB887.  The
registered owner of the Hyundai was Alexis Nicole Terrazas.
Based on my review of certified birth records for Terrazas, I
know that Terrazas is LIMON's daughter.

55.  Officers saw LIMON meet with CS-2, hand her a bag,
then return to her vehicle.  During their brief interaction, CS-
2 informed LIMON that CS-2 would pay for both the fentanyl and
the guns upon delivery of the guns, and LIMON agreed.

56.  Law enforcement recovered the purchased bags of
fentanyl.  DEA laboratory testing later confirmed that the two
bags of pills contained a total of 218.2 grams of fentanyl.

        6.   February 5, 2023 – LIMON Supplies Three Handguns

57.  On February 4, 2023, at 6:19 p.m., shortly after
handing over the 2,000 fentanyl pills, LIMON called the UC from
Limon Cell 1 and said that she would be delivering the firearms

that the UC had agreed to buy from Nunez a couple of days ago. The two agreed to meet the following day.

58.   The next day, February 5, 2023, at 11:46 a.m., LIMON and the UC had another call during which LIMON confirmed that she was going to pick up the firearms and deliver them to the UC.  At 3:19 p.m., Nunez directed the UC to make arrangements for the firearms with LIMON and to pay her the money owed from the fentanyl deal and the firearms.

59.   At around 3:21 p.m., the UC spoke with LIMON and she said that she would meet CS-2 at the same location as the day prior, a McDonalds in Lomita.

60.   At 5:17 p.m., LIMON called the UC and said that she would be meeting with her firearms supplier at a TJ Maxx in Hawthorne and would let the UC know as soon as she had the firearms.  LIMON informed the UC that she believed the female firearms supplier's name was "Lilian" or something similar and she went by the moniker of "Vaga."  LIMON stated that "we buy them from her" referring to the firearms.

61.   Upon hearing this, law enforcement hurried to the TJ Maxx parking lot in Hawthorne to try to surveil the meet between LIMON and her firearms supplier.  At 6:08 p.m., officers saw LIMON arrive in the Limon/Nicolini Camaro.  Surveillance officers took a picture of the Limon/Nicolini Camaro at the TJ Maxx parking lot.  The registered owner of the Limon/Nicolini Camaro was LIMON's daughter, Alexis Nicole Terrazas.

62.   LIMON parked next to a red Mustang with temporary plates, met with the driver of the Mustang who carried a bag

into the Limon/Nicolini Camaro, exited the Limon/Nicolini Camaro empty handed, and then drove away from TJ Maxx.

63.  At 6:28 p.m., Nunez informed the UC that, contrary to their earlier agreement, only 3 guns were going to be delivered and that the price for the guns would be $3,000.

64.  After the meeting at the TJ Maxx, surveillance units went to the Limon Residence and saw LIMON leaving the location in the Limon/Nicolini Camaro.  At 7:06 p.m., LIMON informed the UC that she was 5 minutes away from the meeting.  CS-2 was dispatched to the Lomita McDonalds parking lot in anticipation of a meeting with LIMON.

65.  At 7:18 p.m., LIMON arrived at the McDonald's parking lot where the February 4, 2023 fentanyl deal had taken place. LIMON arrived driving the Limon/Nicolini Camaro that she driven to TJ Maxx to meet with her firearm supplier.  In the audio recording of the deal, LIMON's distinctive voice can be heard saying "it's cinco," referring to $5,000 total due for the guns ($3,000) and the fentanyl ($2,000).  CS-2 gave LIMON $5,000 cash and LIMON handed CS-2 a bag.

66.  After the deal, law enforcement recovered from CS-2: (i) a Glock, model 21, .45 caliber semi-automatic pistol; (ii) a Beretta, model APX, 9mm caliber semi-automatic pistol; and (iii) a Taurus model G2C, 9mm caliber semi-automatic pistol.

   7.  <u>February 9, 2023 – Search Warrant at LIMON's
       Storage Unit Reveals Fentanyl and MDMA</u>

67.  After LIMON mentioned that she was picking up fentanyl pills for the February 4, 2023 deal at the "storage" and told

19

the UC that she was near the intersection Carson Street and
Crenshaw Avenue just before the deal took place, law enforcement
did an internet search for storage facilities near that
location.  That search revealed a Public Storage facility at
that intersection.  Based on LIMON's statements, law enforcement
believed that LIMON may have picked up the fentanyl from that
location on February 4, 2023.

68.  On February 7, 2023, law enforcement met with the
Public Storage manager who provided officers with entry logs for
the facility.  The logs showed that, at 4:23 p.m. on February 4,
2023, user "Alexis Terrazas," LIMON's daughter, had accessed
Unit 3418, Building A.   The timing of this entry is roughly
consistent with LIMON's communications to the UC on that date
during which she told the UC that she had to go to the storage
and was near "Carson Street and Crenshaw" to pick up the
fentanyl.

69.  Public Storage staff also provided surveillance video
from February 4 that showed LIMON pulling into the parking lot
in the same gray Hyundai that she drove to the February 4
fentanyl deal.  LIMON is then seen getting out of the car,
walking over to a gate, entering a code in the keypad, and
walking through the door.  Ten minutes later, LIMON is then
shown leaving the storage facility.

70.  On February 9, 2023, the Honorable Laura L. Laesecke
of the Los Angeles Superior Court issued a search warrant for
Unit 3418 at the Public Storage.  Inside the storage unit, law
enforcement recovered what DEA laboratory testing later

determined to be 218 grams of fentanyl as well as 236.328 grams of MDMA.  Also in the storage unit were two digital scales.

   8. February 13, 2023 – LIMON Supplies Five Guns and Ammunition

  71. Subscriber records reflect that, on February 9, 2023, just after law enforcement searched LIMON's storage unit, she changed her cell phone number to (424) 844-7416 ("Limon Cell 2").  Subscriber info for Limon Cell 2 shows that LIMON was the subscriber of that number.  Nunez also changed his number around that same date.

  72. On February 13, 2023, Nunez agreed to sell the UC five firearms (three pistols, a Ruger, and a shotgun) for $6,000. Nunez said the same woman (LIMON) would handle the deal.

  73. On February 13, 2023, at 2:57 p.m., LIMON messaged the UC from Limon Cell 2 pictures of two handguns and an AR-15 style pistol that she would be delivering later that day.  LIMON told the UC that she would meet him at a mall located at 2665 Pacific Coast Highway in Torrance at 8:30 p.m.  At 8:41 p.m., LIMON messaged the UC that she was in a gray Impala at the meeting location.  The UC directed LIMON to a nearby restaurant parking lot to meet with CS-2 who had already been dispatched to the area.

  74. During the deal, LIMON confirmed that there were 5 guns in the bag and accepted the buy money from CS-2.  After the deal, law enforcement recovered from CS-2: (i) an AR-15 style firearm of unknown manufacturer and bearing no serial number (commonly referred to as a "ghost gun"); (ii) a Glock-style 9mm

caliber ghost gun; (iii) a .45 caliber semi-automatic ghost gun; (iv) a Glock, model 43, 9mm caliber semi-automatic pistol, bearing serial number AFDA626; (v) a Glock, model 43X, 9mm caliber semi-automatic pistol, bearing serial number BWWW050; (vi) 22 rounds of 9mm ammunition; (vii) 2 rounds of 9x19mm ammunition; and (viii) 30 rounds of .223 caliber ammunition.



**D.  DELGADO Handles Methamphetamine and Firearm Deals for Nunez Across the Street from High School and Middle School**

75.  In January 2023 and February 2023, DELGADO fulfilled one methamphetamine deal and three firearm deals that Nunez had negotiated with the UC from prison.  DELGADO personally supplied methamphetamine, firearms, and ammunition to CS-2 and collected money on Nunez's behalf.  DELGADO effectuated all of the deals in the alley behind Delgado Residence, just across the street from the campuses of both San Pedro High School and Dana Middle School.

76.  DELGADO is a high-ranking member of the Westside Wilmas gang with the moniker "Yogi."

77.   DELGADO was on Post-Release Community Supervision ("PRCS"), a form of California probation akin to parole, until January 22, 2023.  DELGADO completed three of the transactions discussed below while on PRCS.

    1.   January 4, 2023 – DELGADO Delivers an Assault Rifle and Ammunition

78.   On January 3, 2023, Nunez messaged the UC a picture of an AR-15 style firearm and said that it was available to purchase the next day in Los Angeles for $2,000.  The UC agreed to NUNEZ's offer.

79.   The next day, the UC received text messages from (951) 226-2897 ("Delgado Cell") from someone who was "[s]topping by on behalf of S," or "Speedy" (NUNEZ).  At 1:29 p.m., the UC and DELGADO spoke by telephone and agreed to meet in San Pedro between 6 and 7 p.m. for the deal.

80.   At 5:59 p.m., DELGADO sent the UC a text message with the address "934 w. 14th street san pedro, ca."

81.   The UC told DELGADO that his courier would be arriving at that location and specified the car that the courier would be driving.

82.   At 6:45 p.m., CS-2 approached the 934 W. 14th Street address and encountered DELGADO.  DELGADO approached CS-2 and told CS-2 to park in the north/south alley just east of the 934 W. 14th Street building.  Once CS-2 went to the alley, DELGADO returned to CS-2's car and asked if CS-2 had anything to cover up the items but CS-2 had nothing suitable.  DELGADO left the area and later returned with a long object covered in linen that

he placed in CS-2's vehicle in exchange for $2,000 in buy money. DELGADO told CS-2 that there were two cartridges, accepted the buy money from CS-2, and thanked CS-2.

83.   Law enforcement later recovered from CS-2: (i) a KE Arms, model KE-15, 5.56 caliber semi-automatic rifle, bearing serial number KF18193; and (ii) 60 rounds of PMC Precision Made Cartridges .223 caliber ammunition in two magazines.



84.   An FBI interstate nexus expert examined the rifle and ammunition from the January 4, 2023 deal with DELGADO and determined that they were manufactured outside the state of California.  Because the items were found in California, I believe that they have traveled in and affected interstate commerce.

85.   As part of his PRCS supervision, DELGADO identified his address to the local probation department as Delgado Residence as recently as December 2022.  Delgado Residence is in an apartment building right next to the alley where DELGADO had CS-2 parked during this January 4, 2023 firearm deal and all

subsequent drug and firearm deals involving DELGADO discussed
here.

        2.   January 10, 2023 – DELGADO Supplies Another
             Assault Rifle and Ammunition

86.   On January 3, 2023, Nunez had offered to sell the UC
two handguns and a semi-automatic assault rifle that, according
to Nunez, would be transported from Arizona to the Los Angeles
area.

87.   Two days later, on January 5, 2023, NUNEZ sent a
picture of an AK-47-style rifle that was also available for
purchase.

88.   On January 8, 2023, NUNEZ called the UC and explained
that the guy from "the last time," DELGADO, would have "the two
long ones and the two short ones" ready for pickup and that the
UC should contact the UC directly to arrange pickup.  On January
10, 2023, NUNEZ agreed to sell all four guns for $5,500--$5,200
for the guns and an additional $300 for transport from Arizona.

89.   At 3:00 p.m., UC messaged DELGADO at Delgado Cell and
confirmed that he would be ready at 4:00 p.m. for the deal.  At
4:28 p.m., DELGADO messaged the UC that he had to run an errand
and would be back in 10 minutes.

90.   At 4:40 p.m., CS-2 arrived at the alley where the
previous deal had taken place.  Around the same time,
surveillance units saw DELGADO arrive in the Delgado Tahoe.  DMV
records show that C.N. is the registered owner of Delgado Tahoe.
As part of his PRCS supervision, DELGADO had told his local

probation department that C.N. lived with him at Delgado Residence.

91.   DELGADO approached CS-2's vehicle and said that he was just getting home.  CS-2 replied CS-2 would just wait in the alley.  DELGADO then came back to CS-2's car and put several items wrapped in clothes on the floor of the backseat.

92.   After the deal, law enforcement recovered: (i) a Century Arms, model AKMS, 7.62x39mm caliber semi-automatic rifle, bearing serial number KMS12189; (ii) two Glock-style, 9mm caliber semi-automatic ghost guns; (iii) an AR-15 style, .223 caliber semi-automatic rifle ghost gun; (iv) one round of Lake City Ammunition 5.56 caliber ammunition; (v) one round of Winchester .223 caliber ammunition; (vi) seven rounds of Armscor .223 caliber ammunition; (vii) 21 rounds of PMC .223 caliber ammunition; (viii) 31 rounds of Hyperion 9mm caliber ammunition; (ix) 31 rounds of Blazer CCI 9mm caliber ammunition; (x) 20 rounds of Wolf 7.62x39mm ammunition; and (xi) 9 rounds of 711 7.62x39mm ammunition.



93.   An FBI interstate nexus expert examined the Century Arms rifle and all of the ammunition from the January 10, 2023 deal with DELGADO and determined that they were manufactured outside the state of California.  Because the items were found in California, I believe that they have traveled in and affected interstate commerce.

3.   January 18, 2023 – DELGADO Delivers 883.9 Grams of Methamphetamine

94.   On January 17, 2023, Nunez offered to sell the UC methamphetamine for $800 a pound.  That afternoon, the UC messaged DELGADO at Delgado Cell and asked if he had five pounds of methamphetamine for sale that day and DELGADO responded that he was "waiting on Speedy."  Efforts to make the deal happen that day came to naught.

95.   The next day, the UC asked Nunez if he could pick up the methamphetamine from the "friend with the toys," DELGADO. Nunez responded that the UC would have to bring the money to DELGADO first then DELGADO would take the money to the methamphetamine source to pay for the methamphetamine.  Nunez said that DELGADO would return to his house to give the methamphetamine to the UC's courier.  The UC agreed to that arrangement.  Nunez said he would sell five pounds of methamphetamine to the UC for $4,000.

96.   At 4:16 p.m., UC and DELGADO had a phone call during which DELGADO confirmed that Nunez had told him about the meth deal and agreed to meet around 6:00 or 6:30 p.m. to get the money from UC.

97.  CS-2 went back to the alley near DELGADO's house where the other deals had taken place.  DELGADO told CS-2 that he was still waiting on the methamphetamine supplier who did not have the methamphetamine ready.  CS-2 said that CS-2 would not give DELGADO the money until everything was ready.  CS-2 then asked if DELGADO had any methamphetamine handy that he could sell, and DELGADO responded that he only had two (pounds of methamphetamine) but didn't want to do the deal without Nunez's approval.  DELGADO told CS-2 to leave and come back when the methamphetamine was ready.

98.  At 7:15 p.m., DELGADO and the UC spoke and DELGADO offered to sell the UC the two pounds in DELGADO's possession for $850 a pound.  DELGADO agreed.  Four minutes later, the UC confirmed with Nunez that he could move forward with purchasing the 2 pounds of methamphetamine from DELGADO.

99.  A short time later, CS-2 returned to the alley near DELGADO's house.  DELGADO came out, put the methamphetamine in CS-2's car, and told CS-2 to look at the meth to see how they were.  CS-2 confirmed that the methamphetamine looked good and gave money to DELGADO who proceeded to count it.

100. Law enforcement later recovered from CS-2 what DEA laboratory testing determined to be 883.9 grams of methamphetamine.

       4.   February 28, 2023 – DELGADO Delivers Guns and Ammunition

101. On February 17, 2023, Nunez offered to sell the UC a tactical shotgun and a Ruger AR-type rifle for $3,000.  On

February 28, 2023, Nunez sent the UC the number for Delgado Cell
and identified him as "the guy you know" and said that he would
have both guns.

102. At 11:47 a.m., on February 28, 2023, DELGADO sent the
UC a message from Delgado Cell that he would be waiting "you
know where," referring to the alley near Delgado Residence in
San Pedro where the previous deals had taken place.  The UC
later confirmed that he would send his associate (CS-2) at
2:30 p.m.

103. At 3:12 p.m., CS-2 arrived at the alley and met up
with DELGADO.  Surveillance units saw DELGADO carrying an item
in a white sheet and put it in the backseat of CS-2's car.

104. DELGADO first approached CS-2 and told CS-2 to move
CS-2's car because school was letting out.  Afterward, DELGADO
said that he had only the two (big) guns but had nothing else to
deliver.  After calling the UC, CS-2 then gave DELGADO $3,000
for the two guns.  DELGADO counted the money and then the two
parted ways.

105. After the deal, law enforcement recovered from CS-2:
(i) a Ruger, model AR-556, 5.56 caliber, semi-automatic rifle,
bearing serial number 85089606; (ii) a Mossberg, model 590, 12-
gauge shotgun, bearing serial number V1340965; (iii) six rounds
of Federal Cartridge Company 12-gauge ammunition; and
(iv) 30 rounds of Precision Made Cartridges .223 caliber
ammunition.





106. An FBI interstate nexus expert examined the firearms and ammunition from the February 28, 2023 deal with DELGADO and determined that they were all manufactured outside of the State of California.  Because the items were found in California, I believe that they have traveled in and affected interstate commerce.

     5.   <u>DELGADO Is a Convicted Felon</u>

107. On April 28, 2023, I reviewed certified conviction documents for DELGADO and learned that he has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

     a.   On or about September 9, 1998, Assault with a Deadly Weapon, in violation of California Penal Code § 245(a)(2), in the Superior Court for the State of California, County of Los Angeles, Case Number NA038708;

b.   On or about July 15, 1999, Assault with a Deadly Weapon, in violation of California Penal Code § 245(a)(2), in the Superior Court for the State of California, County of Los Angeles, Case Number NA041471;

c.   On or about January 25, 2005, Felon in Possession of a Firearm, in violation of California Penal Code § 12021(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number NA060495;

d.   On or about January 25, 2005, Carry Loaded Firearm, in violation of California Penal Code § 12031(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number NA060495; and

e.   On or about August 31, 2017, Felon in Possession of a Firearm, in violation of California Penal Code § 29800(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number NA103717.

6.   <u>Neither DELGADO Nor LIMON Are Licensed to Deal Firearms</u>

108. On May 9, 2023, investigators spoke to ATF Special Agent Stephanie Crebbs who confirmed that neither DELGADO nor LIMON possess a federal firearm license that would authorize them to deal firearms.

**E.   AGUILAR Supplies Firearms and Ammunition for Nunez; Search Warrant at AGUILAR's Residence Yields Methamphetamine, Fentanyl, Cocaine, and Other Firearms**

109. In late November and early December 2022, AGUILAR effectuated two firearm deals that Nunez had negotiated with the UC from prison.

110. AGUILAR is a member of the Burlington Boys street gang with the moniker, "Stalker."

111. AGUILAR is currently in state custody on unrelated charges.

1.   AGUILAR Delivers Firearms and Ammunition

112. On November 27, 2022, UC messaged Nunez and asked him about purchasing "los jugetes," or toys, referring to firearms. On November 29, 2022, Nunez said he had a lot of firearms, sent the UC over a dozen pictures of firearms, and asked UC which ones he wanted.  Nunez said that any guns UC bought would be delivered tomorrow.

113. On November 30, 2022, Nunez sent the UC pictures of two firearms and offered to sell them for $3,500.  The firearms were photographed on top of distinctive yellow storage bin lids and above a painted green floor.

114. Via text message, Nunez then told the UC that the UC could buy the guns at 6101 Avalon Boulevard in Los Angeles at around 7:40 p.m. that day.  Speedy also sent contact information for the person delivering the firearms, "Stalker," with telephone number (858) 304-8784.

115. At 7:32 p.m., the UC called the phone number for "Stalker," and told "Stalker" that he was calling on behalf of "Speedy," and that his courier (CS-2) had arrived at the address.  "Stalker" then said he would be arriving in two minutes.  At 7:35 p.m., "Stalker" called the UC and asked if his courier was parked in the parking lot and UC said yes.  "Stalker" then confirmed the car CS-2 would be driving and that

32

the courier had "something for him," referring to the money for the deal.  "Stalker" said he would meet with CS-2 shortly.

116. Around 7:37 p.m., AGUILAR and CS-2 met up near the 6101 Avalon Boulevard parking lot for the gun deal.  AGUILAR approached CS-2's car on foot carrying a rolling travel suitcase and a black bag and sat in the back seat of CS-2's car.  CS-2 asked AGUILAR if there are two firearms, and AGUILAR confirmed that he had two of them.  AGUILAR opened the luggage bag and showed CS-2 the firearms.  AGUILAR asked CS-2 how much, the CS-2 said $3,500, and AGUILAR replied, "okay."  CS-2 paid AGUILAR the money, and AGUILAR then got out of CS-2's car.

117. After the deal, law enforcement recovered from CS-2: (i) a black Smith & Wesson M&P 15 semi-automatic rifle; and (ii) a CUGIR Mini Draco 7.62x39mm caliber semi-automatic pistol.



118. Surveillance units saw a gray Dodge Charger depart the area of 6101 Avalon Boulevard immediately after the deal and suspected, based on the timing of the Charger's departure, that the driver of the car was the same individual who delivered the firearms.  And because AGUILAR had arrived at the meeting

location so quickly after calling UC, police believed that
AGUILAR likely lived nearby.

119. The next day, December 1, 2022, police canvassed the
area near 6101 Avalon Boulevard looking for the Dodge Charger.
In the front yard of 341 East 60th Street, (the "60th Street
House"), officers saw a gray Dodge Charger bearing California
License Plate 7WIU090, which was registered to AGUILAR.
Officers then found AGUILAR's DMV picture, reviewed the video of
the previous night's deal, and concluded that AGUILAR was the
person who had delivered guns.  The 60th Street House is
approximately .2 miles away (or a 1-minute drive) from 6101
Avalon Boulevard.

        2.   <u>December 7, 2022 – AGUILAR Again Supplies Guns
            for Nunez</u>

120. On December 6, 2022, the UC reached out to Nunez and
asked to buy some guns.  Later that night, Nunez texted UC
pictures of three guns and offered to sell them for $3,500.  UC
asked when the deal would take place, and Nunez said the
"tomorrow if you want" in "Los," referring to Los Angeles.  The
pictures of the guns showed the same distinctive yellow storage
container lids and painted green floor that were shown in the
November 30 photographs discussed above, as well as a wooden
stool.

121. UC asked Nunez how much he would sell the rifle for
and Nunez replied $1,600.  UC said he would buy just the rifle
for $1,600.

122. The next day, around 4:10 p.m., Nunez messaged UC and said that the deal would take place at the same location as the last deal, 6101 Avalon Boulevard.  Nunez said that his people would contact UC.  AGUILAR then called UC using a different WhatsApp number.  UC recognized AGUILAR's voice as the same person who had called before the November 30 gun buy.  AGUILAR said that he was calling about the rifle, confirmed that he and the UC had spoken before (referring to the November 30 gun buy) and said that the meet would take place at the same location as the last deal.  They agreed that the deal would happen around 7:00 p.m.

123. Around 7:29 p.m., surveillance units saw AGUILAR's gray Dodge Charger travel eastbound from the 60th Street House toward the parking lot on Avalon Boulevard.  AGUILAR then got out of his car holding a black duffle bag.  AGUILAR approached CS-2's vehicle.  AGUILAR advised CS-2 that everything is here, and a metallic ping can be heard on the audio.  CS-2 asked AGUILAR if there was only one, referring to one firearm, and AGUILAR confirmed.  CS-2 then asked how much, and AGUILAR said $1,200.  CS-2 then handed AGUILAR the money, and AGUILAR exited, stating "thank you, I'll see you next time."

124. After the deal, law enforcement recovered from CS-2 a black Aero Precision model X15 5.56x45 caliber semi-automatic rifle loaded with 31 5.56x45 rifle rounds.



125. Because of a misunderstanding about the price, CS-2 only gave AGUILAR $1,200 for the rifle.  UC later called Nunez and apologized for the mix-up and acknowledged that he owed Speedy the remaining $400.

126. After the deal, law enforcement followed AGUILAR's gray Dodge Charger back to the 60th Street House where they saw the car park in the driveway and AGUILAR walk into the house.

<ol start="3"><li>  <u>December 14, 2022 – Search Warrant at AGUILAR's House Reveals Methamphetamine, Fentanyl, Cocaine, and Guns</u></li></ol>

127. On December 11, 2022, agents again saw AGUILAR's gray Dodge Charger parked in front yard of the 60th Street House. DMV records also revealed that AGUILAR had listed that address as his residence in 2016.

128. On December 12, 2022, the Honorable Laura Laesecke of the Los Angeles Superior Court signed a state search warrant authorizing law enforcement to look for evidence of state firearms trafficking offenses at the 60th Street House as well as "any storage rooms" or "out buildings" associated with the address.

129. On December 14, 2022, FBI and LAPD executed the search warrant at the 60th Street House.  AGUILAR was not home, but his

girlfriend told police that he lived there and kept his belongings in the back shed.  Inside one of the bedrooms of the main house, law enforcement found AGUILAR's California identification card on the desk.

130. Inside the shed, law enforcement found a number of storage bins and cases containing a total of: (i) approximately 16.44 kg of actual methamphetamine, as confirmed by DEA laboratory testing; (ii) 2.465 kg of fentanyl, as confirmed by DEA laboratory testing; (iii) 1.786 kg of cocaine, as confirmed by DEA laboratory testing; (iv) a Rock Island, model A1-FS, .45 ACP caliber semi-automatic pistol; (v) a black AA Arms, model AP 9 Luger, 9mm caliber semi-automatic pistol; (vi) an AR-15 style ghost gun; (vii) 13 rounds of 9mm ammunition; and (viii) a digital scale.

131. Inside the shed, law enforcement found a distinct yellow storage container lid, a green-painted floor, and a wooden stool that were all seen in photos of firearms that Nunez had sent to the UC before the gun buys with AGUILAR.

132. Police also recovered a distinctive Rock Island Armory, .45 ACP caliber pistol with a wooden handle in AGUILAR's shed.  The pistol was in a photograph of a gun available for sale that Nunez had sent to UC on December 6, 2022, before the second gun buy with AGUILAR.

**F.  October 20, 2022 – GONZALEZ Delivers 2,159 grams of Methamphetamine**

133. On October 20, 2022, Nunez messaged the UC and offered to sell him 5 "waters," or pounds of methamphetamine, for $4,250

(or $850 a pound).  Nunez then sent UC a screenshot of his conversation with his courier stating that the deal would take place at a taco shop near 10930 Garfield Avenue, South Gate.

134. When the UC asked Nunez if he was going to send someone trustworthy to handle the deal, Nunez assured the UC that there would be "nothing funny" because Nunez was "from the Clique, from the Eme."

135. Law enforcement sent CS-2 to 10930 Garfield Avenue area to meet with Nunez's drug dealer.  CS-2 parked at a taco shop across the street from the 10930 Garfield Avenue address. Just before the meeting, Nunez sent the UC a text message saying that his courier was driving a black raised Silverado.  Shortly after, surveillance officer saw Gonzalez Silverado arrive at the location.  Nunez messaged the UC and told him to have his courier meet with GONZALEZ at his truck.

136. Around 8:15 p.m., CS-2 met with GONZALEZ at Gonzalez Silverado.  GONZALEZ confirmed with CS-2 that it was only going to be five pounds to pick up.  GONZALEZ then took a black plastic grocery bag out of Gonzalez Silverado and gave it to CS-2 who, in turn, gave GONZALEZ $4,250.

137. DEA laboratory testing of the five separate clear plastic packages inside the grocery bag GONZALEZ provided confirmed that they contained a total of approximately 2,159 grams (or roughly five pounds) of actual methamphetamine.

138. Officers followed Gonzalez Silverado until it parked in a complex located at 10930 S. Garfield Avenue (the same address that Nunez had originally provided) across the street

from the taco shop where the deal went down.  The truck had
parked in stall number 304.  FBI agents spoke with the manager
of the apartment complex who said that in October 2022 that spot
was associated with an apartment rented to GONZALEZ.  The
manager also identified a photo of GONZALEZ from the deal as the
tenant who rented the apartment associated with stall number 304
throughout October 2022.

### G.   January 20, 2023 – GUERRERO Delivers Guns and Ammunition

139. On January 16, 2023, Nunez messaged the UC a picture
of two assault weapons for sale.  When the UC asked how much,
Nunez replied that he was waiting on a price.

140. On January 19, 2023, Nunez messaged the UC a video of
the same two guns and said that he would sell them for $3,200
for both with delivery in Los Angeles.  The UC agreed and asked
Nunez to have his representative call to make arrangements.

141. On January 20, 2023, at 2:13 p.m., the UC received a
call from GUERRERO who identified himself as "Rocky" who said he
was calling on behalf of "S," or "Speedy."  GUERRERO said that
one of the guns was a "Drake," or Draco model firearm and the
other was an AR.  UC and GUERRERO agreed to meet at 6 p.m. for
the deal.  GUERRERO also said his nickname was "Memo," a common
nickname for someone, like GUERRERO, with the first name
"Guillermo."

142. Later that afternoon, the UC messaged GUERRERO that
the deal would take place at 1299 Artesia Boulevard in Gardena.
At 9:26 p.m., GUERRERO called the UC to confirm that he received

the address and agreed to meet at 9:30 p.m.  GUERRERO said he
would be arriving in a newer red Silverado.

143. At 9:46 p.m., law enforcement officers saw Guerrero
Silverado arrive at the deal.  GUERRERO was the registered owner
of Guerrero Silverado and the address associated with the
vehicle registration was Guerrero Residence.

144. CS-2's audiovisual recording system captured the
meeting with GUERRERO.  CS-2 walked over to GUERRERO's truck and
asked if he was "Memo" and GUERRERO said he was.  CS-2 asked to
bring CS-2's cell phone to take a look at the guns, shined the
cell phone light at the guns, and said they looked great.  CS-2
confirmed with GUERRERO that the price was $3,200 and GUERRERO
collected the money from CS-2.

145. After the deal, law enforcement recovered from CS-2:
(i) a Romarm, Model Mini Draco, 7.62x39mm caliber semi-automatic
pistol, bearing serial number PF-2842-2020; (ii) an AK-style
semi-automatic pistol ghost gun; (iii) five rounds of Norma .223
caliber ammunition; and (iv) fourteen rounds of Cartridge Works
.223 caliber ammunition.



146. An FBI interstate nexus expert examined the Romarm pistol and the ammunition from the January 20, 2023 deal with GUERRERO and determined they were all manufactured outside of the State of California.  Because the items were found in California, I believe that they have traveled in and affected interstate commerce.

147. On April 28, 2023, I reviewed certified conviction documents for GUERRERO and learned that he has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.   On or about April 3, 2009, Carjacking, in violation of California Penal Code § 215(a), in the Superior Court for the State of California, County of Los Angeles, Case Number BA328246;

b.   On or about April 3, 2009, Robbery, in violation of California Penal Code § 211, in the Superior Court for the State of California, County of Los Angeles, Case Number BA328246;

c.   On or about April 3, 2009, Burglary, in violation of California Penal Code § 459, in the Superior Court for the State of California, County of Los Angeles, Case Number BA328246; and

d.   On or about March 17, 2016, Assault with a Deadly Weapon, in violation of California Penal Code § 245(a)(4), in the Superior Court for the State of California, County of Los Angeles, Case Number JCF35877.

**H.   March 9, 2023 — HERNANDEZ Delivers 2.251 kg of Methamphetamine and 212 g of Fentanyl**

148. On March 9, 2023, Nunez agreed to sell the UC five pounds of methamphetamine and five thousand fentanyl pills for $9,000.  Nunez said that the deal would happen that evening and provided the UC with contact information for the person delivering the drugs.

149. That same day, Nunez's contact, HERNANDEZ, called the UC.  HERNANDEZ said he would deliver the drugs that evening at an address he would send later.  HERNANDEZ later messaged the UC that he would meet the UC's contact (CS-2) at 7514 Rosecrans Avenue, Paramount, CA.

150. At 6:40 p.m., the UC called HERNANDEZ and said that his courier had arrived and was waiting in front of the donut shop near the address he provided.  HERNANDEZ said that he was driving a gray Corolla.

151. At 6:46 p.m., Hernandez Corolla arrived at the meeting location and parked next to CS-2's vehicle.  DMV records show that HERNANDEZ was the registered owner of Hernandez Corolla. CS-2 walked over to Hernandez Corolla.  HERNANDEZ said that everything was in order, handed a bag to CS-2, and left the area.  Law enforcement tried to follow HERNANDEZ after the deal but had to stop after HERNANDEZ began using countersurveillance techniques.

152. After the deal, law enforcement recovered from CS-2 what DEA laboratory testing later determined to be 2.251 kilograms of actual methamphetamine and 212 grams of fentanyl.

153. After the deal, Nunez sent the UC pictures of three cars that "the paisa," HERNANDEZ, said had followed him home after the deal.  HERNANDEZ's identification of the vehicles closely resembled the three cars that law enforcement had used to surveil the March 9, 2023 deal and attempt to follow HERNANDEZ.

**I.   March 22, 2023 – NICOLINI Delivers 212 g of Fentanyl**

154. On March 21, 2023, Nunez offered to sell the UC 2,000 colored fentanyl pills via WhatsApp message.

155. The next afternoon, March 22, 2023, Nunez confirmed that the deal would be for 2,000 "fruit loops," or colored fentanyl pills, and that the deal would happen in Harbor City. Eventually, the UC and Nunez settled on meeting at 843 W. Pacific Coast Highway.

156. At 7:43 p.m., surveillance officers saw the Limon/Nicolini Camaro arrive in the parking lot and park next to CS-2's vehicle.  The Limon/Nicolini Camaro was LIMON's daughter's car that LIMON had driven to the February 5, 2023 deal discussed above.  Surveillance officers saw NICOLINI (who surveillance officers recognized from an earlier attempted murder investigation) get out of the Limon/Nicolini Camaro and walk over to CS-2's car.

157. NICOLINI commented on how pretty CS-2's car was, collected the $2,000 in buy money, and said his goodbyes.  Law enforcement officers later compared audio of NICOLINI's jail calls (while in custody earlier this year for an unrelated state

charge) and determined that NICOLINI's voice is heard on CS-2's recording of the March 13, 2023 deal.

158. Law enforcement believes that NICOLINI is a member of the Lomita 13 street gang.

159. After the deal with NICOLINI, law enforcement recovered from CS-2 what DEA laboratory testing later determined to be a total of 212 grams of fentanyl.

### J. Recent Investigation of the Premises and Vehicles to Be Searched

#### 1. Limon

160. On or about February 14, 2023, the Honorable Debra Cole signed a search warrant for ping location data for Limon Cell 2. Since that date, investigators have been monitoring the location of Limon Cell 2. During the evening and early morning hours, Limon Cell 2 is typically at the Limon Residence.

161. On or about May 2, 2023, I reviewed an open source law enforcement database which revealed that the Limon Residence is listed as LIMON's current place of residence.

162. On or about May 2, 2023, I conducted a surveillance of the Limon Residence. I observed the Limon/Nicolini Camaro parked in the driveway of the residence.

#### 2. Delgado

163. On or about April 13, 2023, TFO Makari observed DELGADO exiting the apartment complex housing the Delgado Residence. TFO Makari photographed DELGADO standing outside the building in the alleyway.

164. On or about April 26, 2023, TFO Castruita spoke to a US Postal Inspector who informed him that DELGADO was currently receiving mail in his name at the Delgado Residence.

### 3. Gonzalez

165. On or about April 24, 2023, I conducted an open source query of GONZALEZ which revealed that March 19, 2023, GONZALEZ had a vehicle towed back to the Gonzalez Residence.

166. On or about April 24, 2023, investigators set up surveillance around the Gonzalez Residence.  Gonzalez Silverado was parked in the driveway.  A short time later, investigators observed GONZALEZ in the front yard of the residence.  GONZALEZ checked the mail and went back into the front yard.

### 4. Hernandez

167. On or about March 16, 2023, the Honorable Judge Laura Laesecke signed a state ping warrant for HERNANDEZ's telephone number to assist in locating his whereabouts.  The ping location for HERNANDEZ consistently placed him at the Hernandez Residence.

168.  In March 2023, TFO Castruita requested that LAPD air support resources fly over the Hernandez Residence.  On or about March 20, 2023, TFO Castruita received a video from air support personnel depicting the Hernandez Corolla in the rear of the Hernandez Residence.

169. On March 29, 2023, investigators conducted surveillance of the Hernandez Residence.  I observed HERNANDEZ drive the Hernandez Corolla quickly into an adjacent parking lot and towards the rear of the Hernandez Residence.  HERNANDEZ was

then observed by another investigator circling back onto the street. I again observed Hernandez coming through the same parking lot and towards the back of the Hernandez Residence. HERNANDEZ was looking around at persons and vehicles in the area appearing to be conducting counter-surveillance to ensure he was not being followed back to his residence.

170. On May 2, 2023, investigators again conducted surveillance at the Hernandez Residence. TFO Castruita observed HERNANDEZ arrive in the area driving the Hernandez Corolla and park to the rear of the Hernandez Residence. LAPD air surveillance arrived overhead a short time later and observed HERNANDEZ in the rear of the Hernandez Residence working on the ring doorbell attached to the door of the Hernandez Residence.

    5.   Guerrero

171. On or about May 2, 2023, I reviewed an open source law enforcement database which listed GUERRERO's current residence as the Guerrero Residence. Also on or about May 2, 2023, I reviewed DMV records which listed the Guerrero Residence as Guerrero's address.

172. On or about April 17, 2023, TFO Castruita and TFO Makari set up surveillance around the Guerrero Residence. A short time later, TFO Castruita and Makari observed GUERRERO behind the Guerrero Residence working on the Guerrero Silverado.

173. On or about March 4, 2023, I drove by the Guerrero Residence and observed the Guerrero Silverado parked on the side of the Guerrero Residence.

## IV. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

174. Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.    Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to process, package, and
deliver the drugs and launder the drug proceeds.  Drug
traffickers often travel by car, bus, train, or airplane, both
domestically and to foreign countries, in connection with their
illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, and in their
residences.

c.    Communications between people buying and selling
drugs take place by telephone calls and messages, such as e-
mail, text messages, and social media messaging applications,
sent to and from cell phones and other digital devices.  This
includes sending photos or videos of the drugs between the
seller and the buyer, the negotiation of price, and discussion
of whether or not participants will bring weapons to a deal.  In
addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug

trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## V.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

175. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves

possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DRUG TRAFFICKERS' POSSESSION OF FIREARMS AND AMMUNITION

176. Based on my training, experience, and information and the collective experiences related to me by other law enforcement officers who conduct drug trafficking and firearms

investigations, I am aware that drug traffickers often possess firearms in order to protect themselves, their drugs, and the proceeds of their drug dealing from robbery.  Because drug traffickers are engaged in illegal activity, they cannot rely on the protection of law enforcement to safeguard their valuable property, including controlled substances and cash proceeds of drug trafficking.  Accordingly, drug traffickers often obtain firearms and/or ammunition as a means to safeguard their persons and property given the risks of robbery by customers, competitors, or others who would seek to acquire their drugs or money.

### VII.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[4]

177. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading

filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

178. Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

179. The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

180. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LIMON's, DELGADO's, GONZALEZ's, HERNANDEZ's, GUERRERO's, NICOLINI's, and PASLEY's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of

LIMON's, DELGADO's, GONZALEZ's, HERNANDEZ's, GUERRERO's,
NICOLINI's, and PASLEY's face with his or her eyes open to
activate the facial-, iris-, and/or retina-recognition feature.

181. Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

### VIII.        **REQUEST FOR NIGHT SERVICE**

182. Law enforcement asks permission to execute the
requested search warrants and arrest warrants in the early
morning hours before 6:00 a.m. in order to minimize the risk to
those law enforcement officers charged with executing the
warrants.  LIMON, DELGADO, GONZALEZ, HERNANDEZ, GUERRERO,
NICOLINI, and PASLEY are either gang members or gang associates
with close ties to Mexican Mafia associate Nunez.  Moreover,
DELGADO, GUERRERO, and NICOLINI have significant criminal
history, including convictions for violent offenses and/or
firearms offenses.  Law enforcement believes that these
individuals will be present at the search locations at the time
of the searches.  Based on their backgrounds, law enforcement
believes that these persons may pose a danger to officers
executing the search warrants if aware of their presence before
entry.  Accordingly, law enforcement believes that the searches
of the residences described in this affidavit during daytime
hours, when the targets are more likely to be awake and able to
detect the approach of law enforcement, pose more risk to
officer safety than in the early morning hours when these
individuals are more likely to be asleep.

## IX. <u>REQUEST FOR SEALING</u>

183. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of these applications, complaints, and arrest warrants. I believe that sealing is necessary because the items and information to be seized is relevant to an ongoing investigation into criminal conduct and as far as I am aware, the targets of this investigation remain unaware that they are being investigated.

184. Furthermore, the affidavit contains a lengthy discussion of statements from persons cooperating with law enforcement. Disclosure of this cooperation and the substance of the statements provided by the cooperating persons could place the cooperating persons and their families in danger of retaliation from the persons against whom they are cooperating or other gang members. Disclosure of the search warrant affidavit at this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution. Further, based upon my training and experience, I have learned that criminals often search for criminal affidavits and search warrants via the Internet, and disseminate them to other criminals as they deem appropriate, i.e., post them publicly online through forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this

continuing investigation and may severely jeopardize its effectiveness.

## X. CONCLUSION

185. For all of the reasons described above, there is probable cause to believe that the persons identified above have committed the violations described in paragraph 1.  There is also probable cause that the items to be seized described in Attachments B-1 through B-4 will be found in a searches of the premises, vehicles, and persons described in Attachments A-1 through A-17.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 10th day of May,
2023.

_____
UNITED STATES MAGISTRATE JUDGE